Lonnie C. CARTON
vs.
TRUSTEES OF TUFTS COLLEGE

Civ. A. No. 74-3099-MC

United States District Court
D. Massachusetts

February 20, 1981

Michael B. Keating, David R. Schaefer Toni Wolfmon for the plaintiff.
Robert Glass, Michael R. Coppock, Jack Connolly for the defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**MCNAUGHT, D.J.** The complaint in this action was filed in August of 1974. Plaintiff, having received a "right to sue letter" from the Equal Employment Opportunity Commission on November 30, 1973, made three claims:

(1) unlawful discrimination by Tufts University because of her sex, in violation of Title 7 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.;

(2) alleged breach of her employment agreement by reason of her termination by Tufts University in that, she claimed, she had already achieved "de facto tenure";

(3) violation by Tufts of the Equal Pay Act of 1973, 29 U.S.C. § 206(d).

By amendment, in December of 1976, Dr. Carton claimed various acts of retaliation subsequent to the date that she filed a complaint before the Massachusetts Commission Against Discrimination in November of 1973.

The defendants are the Trustees of Tufts University (Tufts), a private non-profit educational institution, an employer subject to the provisions of 42 U.S.C. §§ 2000e et seq. Tufts is located in Medford, Massachusetts.

Dr. Carton received a B.S. degree from Johns Hopkins University in 1949, an M.Ed. degree from the University of

Maryland in 1951, and an Ed.D. from Pennsylvania State University in 1,957.

In 1964, the plaintiff and her husband had been living in Broomall, Pennsylvania. Her husband was being transferred to the Boston area, and Dr. Carton interviewed with Dr. Burleigh Wellington, the Acting Chairman of the Department of Education at Tufts. Tufts was then looking for a replacement for a Dr. Lonnie Rudd, a specialist in elementary education. He had held a full-time appointment as an Associate Professor, and his responsibilities included not just teaching, but also advising and placing elementary education students for student teaching assignments. Dr. Carton was hired and joined the Education Department in the academic year 1964-65, as a "part-time lecturer." She took on two of the three courses taught by Dr. Rudd, and the advice and placement of elementary education students. Her salary was $5,000.

Prior to her arrival at Tufts in September of 1964, plaintiff had taught at Pennsylvania State University in 1951. She held a part-time position and was paid $1,800, with the rank of Instructor. The following year she was employed by Penn State full-time, and earned $3,600. During the years 1953-54, 1954-55, and 1955-56, she bore two children and was not employed in teaching college.

In 1956-57 academic year, she was a "temporary employee" of West Chester State College, Pennsylvania, for approximately a half of the first semester. She did not teach during the year 1957-58. During that time she bore her third child.

In 1958-59, she was a part-time supervisor of student teaching at Temple University, Pennsylvania. Her course was called "Supervision of Student Teachers." From 1959 through 1964, Dr. Carton was a part-time faculty member at Penn. State. She did work "full-time" for a single 12-week term in the period January through March, 1963. Her highest rank at Penn State was Instructor.

As recited hereinbefore, the offer from Tufts to Dr. Carton was communicated by Professor C.B. Wellington, Acting Chairman of the Education Department. She requested a part-time job. She was appointed part-time Lecturer, and served with that designation through the academic years which began in 1964-65, and concluded in 1969-70. The Chairman of the Education Department was Dr. Daniel Marshall. He had served in that capacity from 1959. On August 16, 1964, plaintiff filled out a personnel record for Tufts. She stated therein that she had been an Instructor at Penn State from 1951 through 1954, an Assistant Professor at West Chester State College during 1957 and 1958, an Assistant Professor at Temple University during 1958-59, and an Associate Professor at Penn State from 1959 through 1964. These were not the facts.

On October 5, 1964, Dr. Daniel Marshall executed a Personnel Change form, increasing Lonnie Carton's salary from $5,000 to $6,350. Her designation was "Lecturer in Education." Progression of academic rank begins with Lecturer, and moves upward through the ranks of Instructor, Assistant Professor, Associate Professor and Full Professor, in that order, in American universities.

The policy of Tufts concerning the acquisition of tenure by faculty members, as in existence in 1964 when plaintiff was hired, was set forth in its 1962 Handbook of Information for the Arts and Sciences Faculty. The handbook distinguished between full-time and part-time faculty, as follows: "A full-time member of the faculty is ordinarily defined as an individual with the rank of Instructor, Assistant Professor, Associate Professor, or Professor, whose teaching commitments per semester are represented by at last six credit hours, accompanied by additional commitments in productive scholarship or teaching so that his total obligation at Tufts is judged equivalent to at least 12 credit hours. . . . Individual interpretations of these standards must necessarily be made. The intent of the University is to regard both good teaching and productive scholarship as responsibilities of a member of the Faculty. Appointments to the Faculty judged to be other than full-time appointments will be qualified as 'part-time' in the employment agreement between the University and the individual." See 1962 Handbook, pp. II-1 and II-2.

The handbook also provided that Lecturers could not acquire tenure. As for acquisition of tenure, the handbook provided that initial appointments would ordinarily be made for successive terms in a probationary period, at the end of which a member of the faculty could anticipate appointment with continuous tenure, unless notified to the contrary in January of the last probationary year. Probationary periods, applying only to full-time members of the faculty, were defined as follows:

If first appointed Instructor, nine years;
If first appointed Assistant Professor, seven years;
If first appointed Associate Professor, five years.

On October 29, 1964, the defendant Trustees adopted a new policy (Exhibit Q) which superseded the former policy and would be effective September 1, 1965. Plaintiff denied at trial having received a copy of the policy, but I find that this was distributed to every member of the Tufts faculty in the year 1964, including the plaintiff. The probationary period was defined as seven years of full-time service. Under the new defintion there was to be credited as part of such probationary period full-time service as a faculty member in all other institutions of higher education not exceeding three years in aggregate, unless the university and the faculty member agreed at the time of employment in writing that a longer period of service would be credited. To be eligible for appointment with permanent or continuous tenure, the faculty member would have to be serving full-time and have the academic rank of Professor, Associate Professor, Assistant Professor, or Instructor. The 1965 Handbook for the Faculty was published, revised, in September of 1965. The Handbook was provided to all faculty members at Tufts, and I find it probable that plaintiff received a copy of it.

### The Claim of De Facto Tenure

The plaintiff worked as a part-time Lecturer, according to designation, at Tufts from 1964-65 to 1969-70. Hired as a replacement for Dr. Rudd, Dr. Carton took on a portion of his former responsibilities, as I have previously found. Dr. Albritton was hired to teach the mathematics and science course (number 135). Dr. Marshall began the briefing of graduate students.

In the fall of 1966, the plaintiff did consulting work at the Quincy School Project in Boston, and later at the New England Medical Center. This work was independent of her responsibilities as a part-time Lecturer in the Department of Education. She was not supervised in this work by anyone on the Tufts faculty. In 1972, it was made part of her then full-time faculty responsibility.

In 1967, Dr. Marshall asked Dr. Carton to add an additional course entitled "Education 136" to her course load for the spring of 1968 for which she would receive an additional $950. Dr. Carton agreed. This gave Dr. Carton the equivalent in hours of a full-time teaching load in comparison to other full-time faculty in the department, but Dr. Marshall was not authorized to add a full-time position to the department.

Between 1966 and 1972, the plaintiff worked on or under several government program grants. She served either as principal investigator or the program director. She spent an average of about 20 hours per week in this outside consulting work, earning $5-6,000 for it in the early years, and later about $7-8,000.

The rules at Tufts provided that a request for promotion or tenure, or both, could be initiated by the candidate. In late 1967, Dr. Carton stated to Dr. Marshall that she wanted to apply for the position of Associate Professor full-time. I do not find that it was Dr. Marshall who suggested to Dr. Carton at that time that she should apply for promotion and tenure. He did, however, advise her of the risks of an unfavorable decision. He did not say that he would support the plaintiff should she make an application. A second conversation was held between the two, in which plaintiff told Dr. Marshall that she wanted her application to go forward, and Dr. Marshall then arranged for the convening of an ad hoc committee, of which he knew he would be chairperson. I find that it was Dr. Carton herself who initiated these procedures, principally by reason of the fact that a letter was sent by Dr. Marshall to the Dean

requesting the formation of the committee, and in it he said that he was forwarding "the request of Dr. Lonnie Carton." Tenure was not mentioned in the letter. Dr. Carton never objected to either of these characterizations.

It is true, as plaintiff has argued, that Dr. Marshall played a critical role in the review of applications for tenure coming from his department. It is true also that Dr. Marshall had never criticized Dr. Carton's performance during her years at Tufts, and that he had recommended her for reappointment on a part-time basis three times. At the time that Dr. Carton's requests for promotion and tenure were forwarded by Dr. Marshall for review to the Dean, Dr. Carton was being carried on the roster of the Education Department as a "¾-time Lecturer." She was officially designated at that time as "Lecturer part-time."

An ad hoc committee was convened by the Provost to review Dr. Carton's application for tenure. The committee consisted of Drs. Marshall, Sussman, C.B. Wellington, Sampson and Milburn. Dr. Sussman, a woman, was familiar with Dr. Carton's outside work. The ad hoc committee recommended unanimously that Dr. Carton should not be appointed on Associate Professor and that she should not receive tenure.

The ad hoc committee's recommendation was dated March 21, 1968, and, in its report, the committee indicated that it considered the following criteria: Dr. Carton's teaching, her service at New England Medical Center, and her intellectual qualities. Drs. Marshall and Wellington, the only tenured members, both opposed Dr. Carton's candidacy for tenure.

On April 18, 1968, Dean Knipp, having been advised of the negative recommendation, had a conversation with Dr. Marshall in the latter's office. Following this conversation, on May 20, 1968, plaintiff received a terminal appointment for the year 1968-69. Subsequent to the receipt of the negative recommendations of the committee, but prior to the issuance of the terminal contract, Dr. Carton visited Dr. Ullman, the Dean of the College of Liberal Arts. I accept Dr. Ullman's testimony that he did not give the plaintiff any assurances for the future. He expected that he would not be in the administration during the following academic year.

Dr. Carton was surprised upon receipt of the information that she would receive a terminal appointment, since she was not aware of the policy at Tufts that such an appointment would issue after a negative tenure review. She could have applied for promotion as an Assistant Professor full-time without tenure, thereby avoiding the risk of a terminal appointment. In January of 1969, she asked for a review of the earlier decision on her request for promotion. As a result she received a further contract of appointment as a part-time Lecturer for the year 1969-70. Dr. Ullman, now Provost, advised Dr. Carton to strengthen her record if she eventually expected to achieve tenure. He advised that she publish written scholarship, and said that her work at the Quincy School provided such an opportunity.

In the year 1970-71, Dr. Carton was promoted to full-time Assistant Professor, and her teaching workload was increased. She now had nine additional students to supervise (an increase from 12 to 21).

Members of the full-time faculty at Tufts were limited to one day per week of outside consulting activity, and assuming full-time status higher than the rank of Instructor put a faculty member in a probationary period with an upper limit of seven years leading to a review for tenure. During her part-time years, plaintiff spent more time engaged in outside consulting that would have been acceptable for a full-time faculty member. During those years records established that 57 faculty meetings were held, and she attended three. When she was appointed full-time, plaintiff prepared another curriculum vita, which she sent to Dean Mumford in 1970. She stated that she had been an Instructor at Penn State, an Assistant Professor at Temple University, and an Associate Professor at Penn State from 1958 to 1964.

The Tufts New England Medical Center was comprised of Tufts' Schools of Medicine and Dental Medicine, three hospitals, and the "Bingham Associates Fund and Program." In 1964, the Quincy Elementary

School, by reason of an arrangement between the Boston Public Schools, Tufts New England Medical Center and the Department of Education, was to be replaced by a new school, serving not only the Chinese community, but a residential community to be constructed next to and serviced by the Medical Center. The new Quincy School, upgrading facilities for families of persons working at the Medical Center, would provide an opportunity to monitor the health needs of elementary school students. In 1966, Dr. Marshall recommended Dr. Carton as a faculty member to assist in developing the educational components. She was hired as an Educational Specialist for the project. I find that her service in this regard was of benefit to Tufts University. Dr. Carton did liaison and planning work at the Medical Center and placed students from the Department of Education in the Quincy School as student teachers. I find that the work of Dr. Carton at the New England Medical Center was valuable to the extent that it was causally related to the reversal of the decision respecting a terminal appointment.

It was Provost Ullman who recommended that Dr. Carton be appointed full-time. Dean Mumford at that time had a conversation with Dr. Marshall, who stated that he would not recommend a full-time appointment for her because he "had reluctantly concluded that there were questions of veracity regarding Dr. Carton." This statement, I find, was precipitated by the issue concerning who suggested that Dr. Carton apply for tenure in 1968. Dr. Carton had insisted that it was Dr. Marshall, and Dr. Marshall had said otherwise. When Dr. Carton sent the vita to Dean Mumford in the spring of 1970, listing an Assistant Professorship at Temple University and an Associate Professorship at Penn State, the vita was followed by a letter in which the plaintiff replied that her employment at Pennsylvania State University and Temple University was on a full-time basis, as was as her employment at West Chester State College. These were not the facts. Tufts, however, gave Dr. Carton credit for three years of full-time service. On March 24, 1971, Dr. Mumford wrote to Dr. Carton

confirming the fact that credit of three years of full-time teaching toward the probationary period of tenure was thereby granted to her.

On April 7, 1970, a Personnel Change Form was completed promoting Dr. Carton to a position as Assistant Professor full-time for the 1970-71 year. Dr. Marshall refused to sign that form, and continued to refuse to sign such forms for Dr. Carton during the rest of his tenure as Department Chairman.

This arrangement in the spring of 1970 established that mandatory review for tenure for the plaintiff would be in the year 1972-73. This formula was established by reason of plaintiff's representation of three years' full-time service at other institutions.

Dr. Carton continued her outside consulting work subsequent to her appointment as a full-time Assistant Professor. She worked about 20 hours per week at the New England Medical Center. In the late spring of 1971, Dr. Stephen Winter was appointed the new Chairman of the Department of Education commencing in September of 1971. In June of 1971, Dr. Bernard Harleston was the new Dean of the Faculty of Arts and Sciences. Dr. Harleston spoke to plaintiff concerning her upcoming tenure review. He advised her of some of the things that she should do (increase her presence and visibility on the campus; develop a record of scholarship and teaching). (See Exhibit 64.) At the beginning of the 1971-72 academic year, plaintiff continued her outside consulting work. Dean Harleston and Professor Winter met and agreed upon an adjustment of her overall work responsibilities so that her outside consulting could be brought into and made a part of her responsibilities as a faculty member in the Education Department. Under the new arrangement the plaintiff's entire compensation was paid by Tufts, and the hospital was to reimburse Tufts. In the spring of 1972, Dr. Carton taught two courses rather than three. Her other responsibilities remained unchanged.

1972-73 necessitated tenure review for Dr. Carton. The process called for the candidate to be reviewed by the tenured members of her department. The department would vote and forward its recom-

mendation to the Tenure and Promotion Committee. The tenured members of the department also forwarded individual confidential letters to the Chairman of the Committee. First, a subcommittee of the Tenure and Promotion Committee (T&P), consisting of two members of the department, two members of the T&P, and one outsider, would review the application, the recommendations and supporting materials, vote, and send a recommendation to the full committee. The full committee would make its recommendation, after review, to the Dean of the Faculty of Arts and Sciences. Further recommendations would be made by the Dean, the Provost, and the President, and a final decision would be made by the Trustees of the University.

Dr. Carton's application for tenure was submitted October 3, 1972. A statement of criteria for tenure decisions was in effect at Tufts in 1972-73. This provided guidelines for cases being considered. This statement provided that the qualities to be considered included: "quality of mind, intellectual force, scholarship, teaching effectiveness, and contributions to departmental objectives and those of the whole University." It provided further that the quality of scholarship would be judged by one's peers and through published works, by papers read at meetings of societies, lectures, and participation in panel discussions.

The application filed by Dr. Carton called for a statement of previous full-time teaching experience at college or university level at the rank of Instructor or higher. Once again, Dr. Carton listed herself as an Instructor at Penn State University, Assistant Professor at West Chester State College, Assistant Professor at Temple University, and Assistant Professor at Tufts. By way of publications and scholarly accomplishments, she stated that she had contributed to the Quincy School Complex. The plaintiff was not one of the five draftsmen of the Complex project. She listed two books for children that she had written and stated that she had edited and contributed two articles to a certain publication, but did not identify the articles. She submitted several supporting teaching evaluations submitted by her students and letters of recommendation and

support by persons familiar with her work outside Tufts.

Tenured members of the Department of Education who met to consider the application included Professors Marshall, Wellington, Lin and Winter. Winter was in favor; Wellington and Lin were opposed. Marshall, known to be opposed, abstained. They agreed to have Professor Zella Luria serve as the outside member of the subcommittee concerning the application, together with Drs. Winter and Wellington. Dr. Winter had urged Dr. Carton to continue on with her outside work in urban education, which for him satisfied the scholarship criterion. Dr. Wellington agreed that Dr. Carton's teaching was good, but raised the question of her trustworthiness. Each of these tenured members of the department submitted confidential letters to T & P. Dr. Winter wrote that her generation of new ideas was appropriate scholarly activity. Dr. Marshall criticized. He said that her statements regarding education did not evidence thoughtful reflection, but "sloganeering". He also doubted her veracity. Dr. Lin suggested that T&P look into Dr. Carton's supervision of a particular student's thesis and her publications to determine the basis of his opposition. Dr. Wellington called her reasonably successful as a teacher, criticized her lack of research, and described her as being a superficial type of person.

On January 4, 1973, the T&P subcommittee, composed of Drs. Gittleman, Palubinskas, Wellington, Winter and Luria, met to consider the application. Two favored it (Winter and Luria); one opposed it (Wellington); there were two abstentions (Gittleman and Palubinskas). The subcommittee reported to the T&P that there was agreement that Professor Carton was as well regarded as any teacher in the department in terms of teaching performance and student evaluations. On the other hand, the subcommittee report stated that Wellington, Marshall and Lin had not been satisfied with the plaintiff's attitude, feeling that she worked solely for her own purposes and was lacking in what was called trustworthiness. Dr. Lin, in a letter to Dr. Stearns, had expressed very serious reservations about

Dr. Carton. At trial, Dr. Lin explained that he had discovered plagiarism in the thesis of a student supervised by the plaintiff. He felt that, had Dr. Carton adequately supervised the thesis, she would have discovered the plagiarism and might have avoided untoward consequences. The thesis related to the Quincy School project.

The subcommittee report was forwarded to the full T&P Committee, consisting of Professors Palubinskas, Gittleman, Simches, Stearns, Nelson and Cormack. The T&P Committee met jointly with the subcommittee and voted 5-9 to table the subcommittee report pending further investigation, to determine the validity of statements concerning Dr. Carton's alleged lack of trustworthiness. Three persons were to be contacted: a Ms. Stephanie Fan, Dr. Mary Brassard (suggested by Dr. Wellington), and Professor Huntley (suggested by Drs. Marshall and Wellington). Ms. Fan did not want to become involved. Neither Professor Huntley nor Dr. Brassard responded to committee requests for letters concerning the plaintiff. Mr. Cormack, Nobel Prize winner in Medicine for theoretical work on the CAT scanner, called a Dr. Richard Thomas in Wisconsin. Dr. Thomas had been Dr. Carton's supervisor in much of her work regarding New England Medical Center Hospital. Dr. Thomas said favorable things about plaintiff, but also described her as being erratic, having difficulty making commitments, and requiring more supervision than he felt that he should have had to give. Drs. Winter and Wellington met with the committee and gave oral statements consistent with their earlier votes.

On January 31, 1973, the committee met and voted on the application of Dr. Carton. Two (Simches and Gittleman) favored it; four (Palubinskas, Stearns, Nelson and Cormack) opposed. Cormack forwarded the T&P recommendation to Dean Harleston. In the report it was stated that Dr. Carton was a good teacher, but had done no scholarly work in the ordinary sense of the work, except for "two slight papers" she wrote in 1955. It was the opinion of the majority that the work done by Dr. Carton at the Medical Center was that of an administrator/fund raiser, not of scholarship. "Lack of scholarship" was the determining factor for the majority of the T&P Committee. Secondary factors were questions raised about the plaintiff's integrity. Sex played no part.

The recommendation of the T&P Committee was the basis for the further administrative action by Tufts University in connection with the tenure application of Dr. Carton. I find it to have been both fair and accurate. The reasons and considerations of the committee were communicated to the Dean, the Provost, the President, and the Trustees. I have considered carefully the objections of the plaintiff as set forth in plaintiff's suggested proposed findings and conclusions. Plaintiff complains that the recommendation of the T&P Committee recited that one member of the subcommittee made the "novel suggestion" that Dr. Carton should not be encouraged to write. She bases her criticism on the fact that the report did not state that the member was her Department Chairman. I find nothing wrong with the manner in which the report dealt with this subject matter. This was a more kindly way of dealing with it than placing in black and white the opinion of the draftsman of the committee report as expressed at trial: "It was idiotic." The 1970 Faculty Handbook encouraged staff to do research leading to publication. Even the minority report filed by Drs. Simches and Gittleman did not state affirmatively that plaintiff's programatic work was a sufficient substitute for scholarship.

On March 16, 1973, Dean Harleston forwarded the recommendation of the T&P Committee to Provost Ullman. On March 2, after Dr. Winter had been informed of the adverse result, he wrote to the Dean stating that the plaintiff was actually completing her ninth year of "de facto" full-time service to Tufts because her teaching load for the years before 1970-71 was full-time. This apparently was the first time that this claim had been made. Dean Harleston's letter to Dr. Ullman was negative and contained questions as to Dr. Carton's scholarship as traditionally defined, the quality and significance of her project activities and matters of personal integrity, intellectual

honesty, and colleageuship. I find no evidence, and consequently make no finding, that the Dean's recommendation was influenced by the fact that Dr. Carton is a woman.

Dr. Ullman, the Provost, received all of the materials which had been before the committee, including both reports and the Dean's recommendation. He concluded that scholarship was lacking and he concurred in the negative recommendation. He did not consider questions relating to Dr. Carton's-integrity. I find no evidence, and hence do not find, that Dr. Ullman was influenced in any way by the fact that Dr. Carton was a woman. Dr. Ullman's recommendation was then forwarded to, and accepted by, the President, who in turn recommended to the Trustees that Dr. Carton's application be denied without explanation. Dr. Carton's application for tenure was denied, and in June 1973, she received written notification that she would be discharged as of August 31, 1974.

In the academic year 1973-74, Dr. Carton presented to the Advisory Committee on Faculty Personnel a claim of de facto tenure. This is one of three elected committees at Tufts, the others being the Committee on Committees, and the Tenure and Promotion Committee. By letter dated November 23, 1973, Dr. Carton wrote to Professor Luria in her capacity as Chairwoman of that Committee. In the letter she stated that she had been employed with full-time responsibilities for over seven years. The members of the committee considering the allegation were Professors Collings, Haynes, McCabe, Legvold and Ounjian. Professor Luria disqualified herself since she had originally suggested to Dr. Carton that she may have earned de facto tenure. Article IV, § 2(a) of the by-laws of the Faculty of Arts and Sciences empowers the committee to make recommendations in matters related to faculty personnel to the President, or in the discretion of the committee, to the Board of Trustees. On January 16, 1974, that committee met. It met with Professor Ruth Whittridge sitting in an advisory capacity. A series of administrators and members of the Department of Education appeared. On February 6, 1974,

the committee issued a report finding that Dr. Carton had served Tufts in a full-time capacity for more than six years prior to receiving a terminal contract, and recommended to President Hallowell that the plaintiff be recognized as a tenured member of the Tufts faculty. Provost McCarthy disagreed. On March 20, 1974, President Hallowell declined to accept the committee's advice. Thereafter, on June 14, 1974, a petition signed by 87 faculty members was presented to President Hallowell urging that the President follow the recommendation of the Advisory Committee. The suggestion was not adopted.

The Advisory Committee had determined that the plaintiff was entitled to credit for three full-time years of college teaching before coming to Tufts. Although such was represented by the plaintiff, I find that, had her representations been truthful, she should have received credit for no more than one year as a full-time Instructor at Pennsylvania State University. Secondly, the committee apparently disregarded the provisions in the 1965 Handbook that appointments other than full-time appointments would be qualified as part-time in the employment agreement between the university and the individual. The plaintiff accepted a part-time contract in 1969-70. Since only full-time years count, the plaintiff had not garnered sufficient time to achieve de facto tenure. She had, at most, five years of full-time teaching and thus would have received timely notice of tenure denial.

The collection of the 87 signatures is certainly impressive. On the other hand, whether any of these signatories knew the facts underlying the de facto claim is another question. I conclude and rule that the defendant is entitled to prevail on Count II of the complaint. The plaintiff did not acquire years toward tenure, regardless of her teaching load. In her complaint, plaintiff alleges that the 1964 Tufts Policy on Academic Freedom, tenure and retirement was part of the contract between her and Tufts. Institutional policy as set forth in the Faculty Handbook was a part of her contract. She is not entitled to rely upon a general policy statement or the commentary

on tenure and academic freedom of the American Association of University Professors, contained as an appendix to the handbook. Only full-time years may be counted in accruing time towards tenure during the probationary period. Plaintiff argues that a portion of the time in which she held part-time appointments at Tufts were in reality full-time years. In order to receive credit, even for those years in which she claims her workload made her service full-time, she would have had to have the academic rank of Professor, Assistant Professor, Associate Professor, or Instructor. She held the rank of Lecturer only. She signed contracts with the university describing her status as such. The instruments were clear, and should have been so, to the teacher who should have known that, during that period of time, she was not "on the tenure track." **Grimm v. Cates, 532 F.2d 1034 (5th Cir. 1976).**

The purpose of a policy regarding tenure should be to avoid problems, not to create them. Both parties should be able to rely on their understanding of the tenure review timetable, and although one may wish to change the running of time, both should have to accept what the clock indicates. The timetable, so far as Dr. Carton was concerned, should have been clear to her. Each and every written contract which she accepted through 1969-70 listed hers as a part-time lectureship. She knew that in 1970 when she became full-time she was being credited with three years of full-time teaching toward the probationary period for tenure. She made no objection. No claim for **de facto** tenure was made until after it appeared clearly that plaintiff would not obtain tenure **de jure.**

### The Claim of Sex Discrimination — Count I

We are called upon to decide whether Dr. Carton has carried the burden of the risk of non-persuasion on the issue that her sex was a determinative factor in the decision not to grant her tenure. For her to prevail she must establish by a preponderance of the evidence that, but for her sex, she would have received tenure. **Sweeney v. Board of Trustees of Keane State College, 604**

F.2d 106 (1st Cir. 1979); **Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1970).**

**Sweeney, supra,** provides the starting point of the analysis of the evidence. Dr. Carton was a member of a protected class within Title VII (being a woman). She was qualified for promotion and tenure. She was rejected, and others with her qualifications were promoted and tenured. I conclude that she has made out a prima facie case.

It is true, as defendant has argued, that qualifications for academic tenure on a faculty cannot be defined in the same sense as qualifications for a job as a mechanic. The guidelines include quality of mind, intellectual force, **scholarship,** teaching effectiveness, and contributions to departmental objectives and those of the whole university. Those persons who were involved in the process of evaluation from the ad hoc committee level to the Trustees were entitled to use that definition of scholarship which was traditional, although plaintiff insists upon being judged on non-traditional grounds. Using the guidelines provided (and granting that they are necessarily subjective), I compare the qualifications of Dr. Carton with those of three males who were considered for tenure by the department within the same period of time as she. These are Professors Lin, Yeager, and Becker. I accept the testimony of Dr. Don Davies, an expert witness, and of Dr. Winter to the effect that she was an excellent teacher and perhaps the best of the four. The relative quality of her service to the university would depend upon whether one followed the traditional view or shared with plaintiff and Dr. Winter a professional preference in favor of an emphasis on urban education. This work in urban education, although devoid of written scholarship, was of conceded benefit to the university. Her scholarship, in my opinion, viewed traditionally, left something to be desired, but the same might have been said of Dr. Lin. I conclude that she was qualified for tenure. There is no question that it was denied to her while the other three named persons received positive recommendations. A prima facie case of sex discrimination, by reason of the establishment of the foregoing elements, was made out by the plain-

tiff.

The defendant Trustees articulated a valid reason for refusing to grant tenure to Dr. Carton: a lack of scholarship. I have determined that plaintiff has failed to establish that the articulated reason for non-promotion was merely a pretext or a litigation strategy, and that, therefore, judgment must be entered for the defendant on Count I.

I have culled all of the evidence to determine whether, on the entirety of the proof, plaintiff has carried her burden, keeping in mind that the establishment of the elements of a prima facie case, despite the articulation of a legitimate reason, would still provide a basis for a permissive inference, should one wish to make it, in favor of the plaintiff.

First, there is no direct evidence of discriminatory animus, by reason of sex, on the part of any individual involved in the refusal of tenure to Dr. Carton. According to Sweeney, supra, and I agree, direct evidence of sex discrimination in a highly sophisticated university setting will rarely be available. We look to the record, therefore, to determine whether there is circumstantial evidence from which discrimination can and should be inferred.

**The Ad Hoc Committee:** I find nothing in the record or the exhibits (See Exhibits 20 and E.) indicating that the plaintiff's sex played any part in their negative recommendation in 1968.

**The Vote of the Tenured Members of the Department of Education in 1972:** These persons were Dr. Winter, the Chairman, Dr. Lin, Dr. Marshall and Dr. Wellington. Once again, I find nothing to indicate that any of these persons was motivated or influenced by Dr. Carton's sex. They had strong feelings one way or another about Dr. Carton's approach to urban education. Dr. Winter was her kindred spirit. Drs. Marshall, Lin and Wellington did not consider her activity a substitute for scholarship. Dr. Marshall, at trial, conceded that he had feelings against Dr. Carton for reasons other than lack of scholarship. He called his feelings "personal doubts as to her veracity." In 1967, Dr. Carton had submitted a proposal for a program grant and had listed Dr. Marshall as having participated in planning. It outraged him to have his name associated with hers. In November of 1968, Dr. Carton had written a letter to Dean Knipp (Exhibit 41), criticizing the Department of Education. She did not send a copy of the letter to Dr. Marshall. He felt that Dr. Carton was taking credit which belonged to other persons, and that Dr. Carton was either untruthful or inaccurate, and in either event, was working against him. He concluded that she blamed failures on other teachers when she herself failed to make student teaching assignments. Plaintiff's sex had nothing to do with this situation. Dr. Marshall testified at trial. He stated that his conclusions had never been influenced by plaintiff's sex, and I accept his testimony. He had opposed candidacies and refused to sign personnel change forms, and had cast negative votes in tenure cases involving males. He had voted in favor of three females in tenure cases. Dr. C.B. Wellington recommended against tenure. He cited a lack of research on her part, the alleged misdirection of a thesis, disorganization in planning, and an inability to work with people. I accept also the testimony of Dr. C.B. Wellington on trial that he was not motivated in any way by the plaintiff's sex. He did state that he was of the opinion that his wife had been discriminated against because of her sex. She was a faculty member of the Department of Education.

Dr. Lin was concerned, in a letter that he wrote on December 27, 1972 (See Exhibit 67), with the unsuccessful thesis which she had directed and suggested that plaintiff's publications lacked quality. This may have been a case of pot and kettle. Despite this, there is no reason to believe that Dr. Lin was motivated in any way by the plaintiff's sex. He had discovered plagiarism in the thesis which the plaintiff had directed and felt that, had her supervision been adequate, she would have discovered it. He, of Chinese descent, had learned that the plaintiff had antagonized Chinese people at the Quincy School. He considered the plaintiff ruthless, domineering, and demanding her own way. Dr. Lin had also supported other females at Tufts University seeking promotion or grants.

**The Tenure and Promotions Subcommittee Vote in 1973:** As recited hereinbefore, the full committee was composed of Professor Stearns (the Chairman), and Professors Cormack, Nelson, Simches, Gittleman and Palubinskas (a woman). The committee felt that, since the plaintiff was a woman, every opportunity should be given her to establish a basis for a positive recommendation. They contacted, or attempted to contact, people outside the university. Ms. Fan preferred not to get involved. Dr. Richard Thomas, who had been plaintiff's supervisor in some of her work testified, having been called by Mr. Cormack. Dr. Thomas did concede to Mr. Cormack that the plaintiff was erratic and required more supervision that should have been necessary. This committee vote (4-to-2, against) was predicated upon the proposition that maturity in scholarship depends upon the exposition of ideas in publications, so that they may be subjected to review and criticism by academic peers. They apparently did not care that the Chairman of the Education Department advised her to abstain from such work. This was the motion that Mr. Cormack described as "idiotic". Sex, I find, played no part in the vote.

**The Dean, the Provost, and the President:** The Dean, Dr. Harleston, cited a lack of scholarship when he agreed with the majority. The Provost concluded that scholarship was lacking, and concurred in the negative recommendation. (See Exhibit 122) In due course, after acceptance by the President, the plaintiff was notified that 1973-74 would be the terminal year. There is nothing to indicate motivation by reason of the plaintiff's sex.

**The Statistics:** The statistical evidence which was offered by plaintiff and received in evidence did not establish sexual discrimination against her. To put it otherwise, after a study of these statistics, I cannot confidently derive any reliable inference from them. The smallness of the numbers available for study diminishes their importance. The Department of Education, it is true, has not had a tenured woman since before World War II, but it has had only four tenured members. In the decade prior to 1979, there appears to have been no statistically significant difference between the rate at which Tufts granted tenure to males and the rate at which it granted tenure to females. Indeed, when non-lateral entry tenure cases are taken into consideration, the percentage difference between males and females becomes an advantage in favor of woman. In the faculty of Arts and Sciences the hiring of women by the university for full-time positions has exceeded the percentage of women in the available pool. It is noteworthy also, when one considers statistics, that plaintiff chose to be compared to Drs. Yaeger, Becker and Lin. The first two were denied tenure for lack of scholarly credit. Dr. Lin had done scholarly research, although its quality was doubtful. Only Dr. Lin achieved tenure. There were discrepancies, but underlying explanations for the discrepancies would have to be ignored. Plaintiff claimed that women were relegated unfairly to part-time status. In many instances the women requested part-time status for family reasons, or wanted to pursue other work which would be inconsistent with a full-time position. With respect to the departure of women from Tufts, there were non-sex-related factors which apparently were not explored. Women might have left to bear children, or to follow their spouses to other geographical locations. At any rate I do not find that the difference statistically is significant.

I conclude that the determinative factor in the negative decision was indeed Dr. Carton's lack of traditional scholarship. This was a real and stated reason. It is a fact that questions relating to her reliability, integrity, intellectual honesty and colleagueship played a part also, but I do not conclude that the stated reason was a pretextual mask for discriminatory consideration. The tenure criteria would apply to her personal qualifications. The procedures prescribed by Tufts were fairly and reasonably followed.

I have taken into account the testimony of Professor Field, Dr. Marian Fahey, Dr. Betty Akiba, Dr. Jean Wellington, Dr. Luria, Dr. Winter, former Dean Antonia Chayes and others concerning the competence of Dr. Carton and her skill in working with people. I have considered the

petition which was signed by her colleagues urging that she be kept on the faculty. These run counter, there is no question, to the contention that she lacked "collegiability". It does not follow that "colleagueship" was a pretext for discrimination. The same standard was applied to Dr. Carton as was applied to her male counterparts.

## The Claim of Retaliation

Plaintiff claims that Tufts has engaged in retaliatory conduct violative of Title VII and Mass. Gen. Laws, c. 151B; § 4. Under Massachusetts law it is an unlawful practice for an employer to discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint. On November 30, 1973, Dr. Carton filed charges with the E.E.O.C. and with the Massachusetts Commission Against Discrimination, charging that her protests had provoked retaliation. By amended complaint she alleges continuing retaliatory conduct by Tufts from that time to the present. Dr. Carton insists that there was discrimination in the manner in which other faculty were paid, in excluding her name from official Tufts publications, and for effecting a radical change in the nature of her participation in university life. She asks damages for the alleged unlawful retaliation. Dr. Carton testified that Tufts paid her less salary than she was entitled to. There was some confusion respecting amounts paid and received. The claim apparently should have been in the amount of $1,621.15 over a six-year period. I find that any delay with respect to receiving monies due was by reason of a good faith disagreement as to whether Tufts had agreed to give salary raises to the plaintiff after the suit in this case was filed and an injunction issued. I find no evidence of a retaliatory motive.

Subsequent to the issuance of the temporary restraining order in this case, Dr. Carton was told that the University would no longer sign off on grants on which she was listed. Although she testified that the refusal was because "she wouldn't be around the University long enough," I find that the conduct of her employer was consistent with its policy of requiring all faculty whose appointments might be tentative to nominate a second person to be principal investigator on grants. Once again, I find no evidence of retaliatory motive.

Dr. Carton, in 1976, received a radio award from the American Psychological Foundation, and the CBS affiliate in Boston, WEEI radio, notified Tufts that she had won the award. Tufts, protests Dr. Carton, did not congratulate her or publicize the award through its own media. "There was merely a line or two in an issue of the Criterion, several months after the award." I am unable to find that Dr. Carton in this regard was treated any differently than were other members of the faculty; hence, I find no harm that she suffered in that regard. The article mentioned her WEEI-produced radio educational series "The Learning Center", the fact that it was heard on all CBS-owned stations, and the fact that it had been chosen in the National Media Awards Competition. The announcement concluded, "The awards are presented annually to recognize outstanding accurate reporting which contributes to the public understanding of psychology." I find no retaliation.

It is true that Tufts University omitted the name of Dr. Lonnie Carton from its 1975-76 catalog. At that time, however, the parties expected a trial on the merits of the case. The uncertainty of plaintiff's status, therefore, which was handled on a month-to-month basis, rather than on the 12-month computer program, is understandable. Dr. McCarthy, Provost, testified that the omission was accidental, and I believe that it was.

## Conclusion

I conclude that the plaintiff had no right to relief on any of the counts of her complaint. She has failed to establish that Tufts discriminated against her because of her sex (Count I); has failed to establish that "de facto tenure claim" (Count II); has failed to make out a case of unlawful retaliation against her for asserting her discrimination claim (Count IV); and has failed to show any sort of salary or wage discrimination.

The defendant, Trustees of Tufts College, are entitled to judgment in their favor, and it

226

shall be entered.

McNaught
United States District Judge